UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BRENT RUSSCHER,** *et al.*,

    **Plaintiffs,**

v.

**OUTDOOR UNDERWRITERS, INC.,** *et al.*,

    **Defendants.**

Case No.: 2:17-cv-1085
**JUDGE SMITH**
**Magistrate Judge Deavers**

## OPINION AND ORDER

This matter is before the Court on four separate motions: 1) Plaintiff Holland Community Hospital's Motion for Summary Judgment (Doc. 45); 2) Defendant Outdoor Underwriters, Inc.'s Motion for Judgment on the Pleadings or, Alternatively, Motion for Summary Judgement (Doc. 46); 3) Defendant Certain Underwriters at Lloyd's of London subscribing to Policy 02HU11B0050's ("Lloyd's of London 50") Motion for Summary Judgment (Doc. 47); and 4) Defendant Certain Underwriters at Lloyd's of London subscribing to Policy 02HU11B0068's ("Lloyd's of London 68") Motion for Summary Judgment (Doc. 48). All four motions are fully briefed. For the reasons that follow, Holland Community Hospital's Motion is **DENIED**, and the remaining three Motions are **GRANTED**.

### I.    BACKGROUND

**A.    Procedural Background**

In 2014, Plaintiff Brent Russcher and his wife Plaintiff Jamie Russcher filed suit in this Court for damages Brent suffered as a result of a hunting accident that took place on land leased by Defendant Mark Thompson as the owner/operator of Ohio Whitetail Adventures (hereinafter,

"OWA"). *See* Case No. 2:14-cv-00002, *Brent Russcher, et al. v. Mark Thompson, et al.* ("2014 Lawsuit"). Plaintiff Holland Community Hospital was added as a party on March 4, 2015. At the time of Russcher's accident, he was a Covered Individual under the Holland Hospital Health Care Plan, which covered a portion of Russcher's medical expenses. The Holland Plan contained subrogation and reimbursement clauses, which would entitle the Hospital to an assignment and first priority right of subrogation against a responsible party. In December 2015, Plaintiffs entered a stipulation with Thompson in which Thompson "individually as well as doing business as Ohio Whitetail Adventures" stipulated to his liability for Russcher's injuries. (2014 Lawsuit, Docs. 105, 107). The Lloyd's of London Defendants, the parties through which Thompson was insured, have denied coverage for Thompson, OWA, and Thompson's other business entity—Mark & Tommy Hunt Club (hereinafter, "MTHC")—under each's respective policy. Plaintiffs then filed this suit as judgment creditors under Ohio Revised Code § 3929.06(C)(1), alleging that the Lloyd's of London Defendants improperly denied coverage in connection with Russcher's accident.

**B.     Factual Background**

At issue in this case are two separate $1 million insurance policies purchased by Thompson. Also central to this dispute are two tracts of land: a 386-acre tract of land owned by Earthtouch and a 289.77-acre tract of land owned by Scioto Land Company. The final component essential to understanding this case is the existence of two entities owned and operated by Thompson: OWA and MTHC.

**1.  Ohio Whitetail Adventures and Mark & Tommy Hunt Club**

By all accounts, Thompson started OWA in 2009 as a commercial hunting outfitter and guide business. OWA customers would pay Thompson for lodging, access to land for hunting—including tree stands—and guidance regarding the hunt itself. (Doc. 44, Thompson Dep. at 22–26). OWA was an advertised, commercial, for-profit venture and had a trade name registered with

2

the Ohio Secretary of State. (*Id.* at 20, 28–29). Ultimately, OWA was not as profitable or successful as Thompson had hoped and, in early 2012, he began to merge the company's operations into those of MTHC. (*Id*. at 27–28). Whereas OWA was a commercial, for-profit business venture, MTHC was formed in 2008 to serve as a means by which Thompson and other members of the club could hunt a common area without providing the additional services typically provided by an outfitter or guide.

### 2. The Earthtouch Property and "Policy 50"

In 2010 or 2011, Thompson was in communication with Earthtouch, who owned a 386-acre tract of land, about him leasing the land for hunting purposes. While negotiations were ongoing, Thompson was permitted to enter onto the property for the limited purpose of surveying the land and identifying boundary markers. (*Id.* at 42). Notably, he never had permission to hunt anywhere on the property. (*Id.*). In December 2011, Thompson (as Ohio Whitetail Adventures) applied for coverage under Commercial General Liability Policy 02HU11B0050 ("Policy 50"), which was intended to provide general liability coverage for Earthtouch as the landowner in addition to Thompson and his chosen business entity. In the application field marked "Hunt Club," Thompson identified "Ohio Whitetail Adventures" with himself as the representative. (Doc. 47-2, Policy 50 App. at PAGEID #1493). The Policy 50 application identified the covered premises as "400 acres in McArthur, Vinton County, Ohio" and listed "Earthtouch – Maureen Metcalf" as the only owner of the land. (*Id.*). The description did not include a metes and bounds description of the property, nor did it go into any additional detail aside from what is described here. The application explicitly stated that commercial hunting operations, guide services, outfitters, or subleased properties were not eligible for coverage under the policy. (*Id*. at PAGEID #1494). Both Thompson and Earthtouch understood that securing this insurance coverage was a prerequisite to the lease being executed. Ultimately, Thompson received a Certificate of Insurance

3

under Policy 50 but never leased the Earthtouch land. The language on the Policy 50 Certificate of Insurance pertaining to the hunt club's identity and the Earthtouch property itself matched that provided by Thompson on the application, as described earlier in this paragraph. (*See* Doc. 1-2, Policy 50 at PAGEID #24).

Policy 50 contains the following relevant clauses and limitations:

- **NAMED INSURED:** IT IS AGREED AND UNDERSTOOD THAT THE HUNTING CLUBS ARE NAMED INSURED ON PROPERTY DESIGNATED AND ON FILE WITH THE COMPANY.
IT IS FURTHER AGREED AND UNDERSTOOD THAT ADDITIONAL CLUBS AND PROPERTY MUST BE REPORTED TO THE COMPANY WITHIN 30 DAYS FROM EXECUTION OF THE HUNTING LEASE AGREEMENT.

(Doc. 1-2, Policy 50 at PAGEID #72).

- **DESCRIPTION OF COVERAGE:** It is hereby agreed and understood that this insurance applies only to occurrences arising out of the activities and operations of the hunt club and its members, guests, invitees, agents, or employees on acreage leased to the Hunt Club by [QDMA] Landowners.

(*Id.* at PAGEID #73). Policy 50 provided coverage limits of $1,000,000 for bodily injury and/or property damage per each occurrence and a general aggregate limit of $2,000,000. (*Id.* at PAGEID #24).

3. **Scioto Land Company and "Policy 68"**

Around 2008, Thompson formed MTHC for the purposes of renting a separate, 289.77-acre tract of land owned by Scioto Land Company. It appears this lease was renewed on a yearly basis and the renewal most relevant to this action was entered into on or about October 1, 2011. (Doc. 44, Thompson Dep. at 34). The lease was titled a Hunting License and granted MTHC a revocable license to use the property for hunting purposes only, through June 30, 2012. (*Id.* at 35). The Hunting License identified six people as members of MTHC and explicitly prohibited commercial hunting and fishing activity on the property. (Doc. 48-2, Hunting License at PAGEID

4

#1538, 1542). There was also a clause stating that Scioto Land Company was required, at MTHC's expense, to maintain a liability insurance policy for covered activities on the property. (*Id.* at PAGEID #1539).

Pursuant to the terms of the Hunting License, Scioto Land Company, through its affiliate RMK Timberlands Group ("RMK"), maintained a comprehensive general liability insurance policy through one of the Lloyd's of London Defendants. (*See* Doc. 45-3, Commercial General Liability Policy No. 02HU11B0068 (hereinafter, "Policy 68")). Policy 68 named RMK as the insured "As Lessor and Hunting Clubs as Lessee," but was amended to include as named insureds, "F&W Forestry Services, Inc." and "Scioto Land Company – and Mid-Continental Timberland Fund . . . as Licensor and its Hunting Clubs as Licensee." (Doc. 45-3, Policy 68 at PAGEID #1168, 1191). Therefore, MTHC was an insured under Policy 68 because it was a licensee of Scioto Land Company. Policy 68 contains the following limitation on coverage:

> GENERAL LIABILIY ENDORSEMENT: . . . DESCRIPTION OF COVERAGE:
> It is hereby agreed and understood that this insurance applies only to occurrences arising out of the activities and operations of the hunt club and its members, guests, agents or employees on acreage leased to the Hunt Club by RMK Timberland Group.

(*Id.* at PAGEID #1236). Similar to Policy 50, Policy 68 provided coverage limits of $1,000,000 for bodily injury and/or property damage per each occurrence and a general aggregate limit of $2,000,000. (*Id.* at PAGEID #1187).

4. **Russcher's Contact with Thompson and His Accident**

Russcher and his friend, Shane Burch were both residents of the state of Michigan for all times relevant. They contacted Thompson and arranged to hunt on Thompson or OWA's land in January 2012. Russcher initially found Thompson and OWA through an internet search. (Doc. 43, Russcher Dep. at 13, 31). It was around this time that Thompson began transitioning OWA's operations into MTHC. Thompson testified that he told Russcher he was "rolling everything over

5

to a hunt club, so when they booked, they could come and go, basically, as they please." (Doc. 44, Thompson Dep. at 63, 65). The majority of the planning and booking was conducted between Thompson and Burch, and Thompson rarely spoke to Russcher during the planning stages. (*Id.* at 63). Thompson admits that his operation, at the time Russcher and Burch booked their trip and began their hunt, was still operating as OWA and he never informed the pair of the name of MTHC prior to them coming to Ohio for their hunt. (*Id.* at 63–64). Ultimately Russcher agreed to pay Thompson $1,300[1] in exchange for the right to hunt on Thompson or OWA's property for four days. (Doc. 43, Russcher Dep. at 16, 18). Russcher later testified that he was not sure exactly what type of arrangement he was signing up for, but, at all times, he understood he was dealing with Thompson as the owner of OWA and prior to January 9, 2012, he was never under the understanding that he was coming to Ohio to join a hunt club. (*Id.* at 31–33). Russcher also testified that he thought—or hoped—that in exchange for his $1,300, he would be provided with a place to sleep for three or four nights, food, some sort of guide service, and access to land, tree stands, and climbing steps.[2] (*Id.* at 34–36). Despite these expectations and the information on OWA's website that held Thompson out to be an outfitter, Russcher was unable to recall whether Thompson ever told him personally that Thompson would be an outfitter for his hunting trip. (*Id.* at 37).

Upon arriving in Ohio for his hunt, Russcher found the accommodations and services he thought he was paying for to be less than he had envisioned. Nevertheless, Thompson gave Russcher directions to a tree stand located on Scioto Land Company's plot of land. (*Id.* at 37). On January 9, 2012, during the period of time in which he was permitted to hunt on Thompson's

---

[1] It appears the parties had originally agreed that the fee would be $1600, but ultimately settled on $1300. (*Id.* at 16).
[2] Russcher testified elsewhere that he did not have an expectation that Thompson or OWA would provide him with meals. The parties also agree that it was understood that Thompson would not process any deer that were shot by Russcher or Burch. This is a service that an outfitter would typically provide. (*Id.* at 14–15).

6

leased land, Russcher fell from a tree stand and suffered extensive injuries to his cervical spine and ribs. At some point in time, Thompson told Russcher and/or Burch that they would be permitted to return to the land to hunt or fish in the next calendar year, free-of-charge. Burch took advantage of that offer, but Russcher did not. (*Id.* at 18). Thompson did not provide notice of the injury to any representatives of his insurers until September 2013—nearly 20 months after the injury occurred.[3] (Doc. 44, Thompson Dep. at 101–02).

## II. STANDARD OF REVIEW

All four motions for summary judgment currently under consideration are submitted pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial

---

[3] The parties briefed the issue of whether the 20-month delay in reporting the injury voided coverage under the Policies. Because the Court is deciding these motions on alternative grounds, it is not necessary to touch on those arguments.

7

burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

### III. DISCUSSION

As Holland Community Hospital has succinctly put it:

> It is undisputed that the two [Policies][4] existed at the time of Russcher's injuries. It is likewise undisputed that Russcher's injuries occurred on property leased to Thompson by [Scioto Land Company]. Therefore, the remaining question of law is whether Plaintiffs are entitled to recover under one, or both, of the insurance policies as a result of the injuries.

(Doc. 45, Holland Cmty. Hosp. Mot. for Summ. J. at 10). As noted above, currently pending before the Court are four motions for summary judgment. Three of those motions focus on the central issue of whether one, or both, of the Policies are enforceable to the detriment of the Lloyd's of London Defendants. The fourth motion, filed by Defendant Outdoor Underwriters, addresses

---

[4] Where Policies 50 and 68 are referenced collectively, they are given the defined term "Policies."

8

the ancillary issue of whether Outdoor Underwriters must afford coverage as an insurer under one or both of the Policies. The Court will address Outdoor Underwriters' motion before addressing the remaining three motions collectively.

## A.     Outdoor Underwriters is not an Insurer Under Either Policy

Defendant Outdoor Underwriters moved for judgment on the pleadings, or alternatively, summary judgment on the claims alleged against it on the basis that "Outdoor Underwriters is not an insurer, was not a party to the Policies, and would not have any obligation to make any payment to or on behalf of any insured under the Policies." (Doc. 46, OU Mot. for Summ. J. at 1). Plaintiffs Brent and Jamie Russcher[5] counter that Outdoor Underwriters was much more involved in the formation and execution of the Policies than a typical agent would be. Specifically, the Russchers draw attention to the fact that Outdoor Underwriters "was very involved in the marketing and underwriting of the insurance policies at issue;" that according to Outdoor Underwriters' website, its "programs are designed and backed by certain underwriters at Lloyd's of London[;]" that a material term of Policy 50 was effectuated through the endorsement of Ohio Underwriters; and "Ohio Underwriters is identified on at least 18 pages of [Policy 50] and 15 pages of [Policy 68]." (Doc. 53, Russcher Resp. at 3–5). The Russchers also claim that the Policies list both Lloyd's and Outdoor Underwriters as insurers under the Policies.

The Court is not convinced by the Russchers' arguments. Outdoor Underwriters posits that the use of the word "underwriter" in its name may be somewhat misleading, but the record is devoid of any facts that support the Russchers' claims that it is an insurer. The Court agrees. Outdoor Underwriters is frequently identified in the Policies, but the Court cannot identify a single place where it is identified as an insurer. To the contrary, Policy 50 contains a clause that explicitly

---

[5] Plaintiff Holland Community Hospital did not respond to Outdoor Underwriters' motion.

states that "Certain Underwriters at Lloyds, of London" is the named insurer and is responsible for 100% of the insured risk. (Doc. 1-2, Policy 50 at PAGEID #54). Policy 68 does not include a similarly explicit statement but is notably devoid of any language identifying Outdoor Underwriters as the insurer.

As support for their argument, the Russchers rely on *Rock Holdings, Inc. v. Certain Underwriters at Lloyd's London*, No. 09-11599, 2009 WL 2475400 (E.D. Mich. Aug. 11, 2009). Plaintiffs argue that *Rock Holdings* stands for proposition that because the full identities of the syndicates at Lloyd's who backed the Policies were undisclosed, then the agent, or "correspondent," (in this case, Outdoor Underwriters) cannot be dismissed for Lloyd's' alleged breach of the policy. *Rock Holdings*, at *3. In *Rock Holdings*, a decision that was made at the motion-to-dismiss stage, the Court noted that no representative of Lloyd's or the agent/correspondent had affirmatively asserted under oath that the agent/correspondent was not a member of one of the syndicates at Lloyd's who backed the policy. In contrast, here, the Vice President of Outdoor Underwriters has submitted a valid declaration stating that Outdoor Underwriters: 1) is not an insurer; 2) is an insurance broker that helps its clients obtain coverage from Lloyd's and other insurers; and 3) the policies it obtains for its clients are underwritten by members of the Lloyd's insurance market. (Doc. 46-1, Wilson Dec. at ¶¶ 4–6). Therefore, while it may be that the exact identities of the Lloyd's syndicates backing Policies 50 and 68 are undisclosed, the Court has credible evidence that those syndicates do not include Outdoor Adventures.

After review of the Policies' plain language and the declaration of Edward Wilson, the Court is convinced that Outdoor Adventures is not an insurer or underwriter for either of the Policies. Rather, Outdoor Adventures merely served as a broker/intermediary for the Policies. In

sum, Outdoor Adventures shouldered its initial burden, and Plaintiffs have failed to set forth specific facts showing that there is a genuine issue for trial as to whether Outdoor Adventures was an insurer under either of the Policies. Accordingly, Outdoor Adventures' Motion for Summary Judgement is hereby **GRANTED**.

**B.     Defendant Lloyd's of London 50 is not Liable Under Policy 50**

Lloyd's of London 50 posits several theories under which it is not liable under Policy 50: 1) the accident did not occur on the Earthtouch property; 2) OWA was a commercial operation, and Russcher was a customer of OWA at the time of his accident; and 3) coverage was barred by Thompson's failure to provide timely notice of the accident. Plaintiffs counter that: 1) Policy 50 was ambiguous as to the land covered under the Policy; 2) that at the time of Russcher's accident, Thompson was running his business as a hunt club; and 3) Thompson's notice to the Lloyd's of London Defendants was timely and unprejudicial.

**1.   The Accident did not Occur on Land Covered by Policy 50**

Plaintiffs seek to sew ambiguity into the policy language that limited the coverage area to the Earthtouch Property in two ways. First, Holland Community Hospital argues that Policy 50's description of the land covered under Policy 50 is ambiguous because it is described only as "400 acres of Earth Touch Property in Vinton County, Ohio." (Doc. 45, Holland Cmty. Hosp. Mot. for Summ. J. at 12). Holland Community Hospital then seeks to have this Court consider the extrinsic evidence that Thompson intended Policy 50 to cover the Scioto Land Company property—which was 289.77 acres—plus 100 acres of Earthtouch land, rather than just the 386 acres of Earthtouch land, when he applied for Policy 50. (*Id.*, citing Doc. 44, Thompson Dep. at 108–10, 129). Second, the Russchers argue that Policy 50 limits covered occurrences to the "coverage area," and the term "coverage area" is later defined in Policy 50 to include all of the United States. (Doc. 52, Russcher Resp. at 11).

"It is a well-known and established principle of contract interpretation that '[c]ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.'" *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St. 3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 9 (quoting *Skivolocki v. E. Ohio Gas Co.,* 38 Ohio St. 2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus). "Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Id.* (quoting *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313–14, 667 N.E.2d 949 (1996). However, there is a presumption "that the intent of the parties to a contract is within the language used in the written instrument." *Saunders v. Mortensen*, 2004-Ohio-24, 101 Ohio St. 3d 86, 801 N.E.2d 452, ¶ 9 (citing *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 509 N.E.2d 411 (1987), paragraph one of the syllabus). Further, Courts need not interpret the contract if they are able to determine the intent of the parties from the plain language of the agreement. *Id.*

Plaintiffs' characterization of the description of land covered is not completely accurate and its argument is not availing because Policy 50's Certificate of Insurance also identified "Earthtouch – Maureen Metcalf as the "Landowner(s)." This clearly evinces an understanding between the parties that Policy 50 was intended to cover the Earthtouch land, and only the Earthtouch land. Similarly, it is clear that Scioto Land Company is not listed as a landowner anywhere in Policy 50. Also, it is clear that the parties never intended for Lloyd's 50 to indemnify against all injuries occurring in the United States. A finding to that effect would render any of Policy 50's references to the specific leased premises meaningless. It is well-established that agreements are to be interpreted as a whole, and "it is assumed in the first instance that no part of its superfluous." Restatement (Second) of Contracts § 203, Comment b (1981). Further, "[w]ell-

founded principles of contract law establish that 'specific terms and exact terms are given greater weight than general language.'" *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 420 (6th Cir. 2008) (quoting Restatement (Second) of Contracts § 203(c) (1981)); *see also*, *Gibbons-Grable Co. v. Gilbane Bldg. Co.*, 34 Ohio App. 3d 170, 175, 517 N.E.2d 559, (8th Dist. 1986) ("It is also well-established in Ohio that where two clauses of a contract appear to be inconsistent, the specific clause prevails over the general.").

Because no ambiguity exists and reasonable minds can reach but one conclusion—that Policy 50 covers the Earthouch land, and only the Earthtouch land—judgment as a matter of law in Lloyd's of London 50 is appropriate. The Court need not discuss the commercial nature of Thompson's operation or Thompson's potentially late and/or prejudicial notice to the Lloyd's of London Defendants.

C.     **Defendant Lloyd's of London 68 is not Liable Under Policy 68**

As noted above, it is undisputed that Russcher's injury occurred on Scioto Land Company's land. It is also undisputed that OWA is not a named insured under Policy 68. The Scioto Land Company maintained Policy 68, and the coverage thereunder extended to MTHC by virtue of the fact that it was a licensee of Scioto Land Company. Therefore, the ultimate question of coverage under Policy 68 boils down to whether Russcher's injuries arose "out of the activities and operations of the hunt club and its members, guests, invitees, agents or employees[.]" (Doc. 1-3, Policy 68 at PAGEID #138). Plaintiffs argue that OWA and MTHC were either indistinguishable/interchangeable at the time of the accident because Thompson had begun rolling OWA's operations into a hunt club, or, relatedly, that Russcher was hunting on Scioto Land Company's land as a guest or member of MTHC. Lloyd's of London 68 counters that Russcher transacted all business with Thompson through OWA, not MTHC.

13

While it is not the Court's purpose to weigh the evidence at this stage, the scant support for Plaintiffs' argument fails to raise a material question for trial. "The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party." *Austin v. Memphis Light, Gas & Water Div.*, 129 F.3d 1263 (6th Cir. 1997 (citing *Anderson*, 477 U.S. at 251). Plaintiffs' entire argument rests on several non-material facts. Specifically, Plaintiffs rely on Thompson's testimony that, at some point, he told Burch he was "rolling everything over to a hunt club, so when they booked, they could come and go, basically, as they please" (Doc. 45-1. Thompson Dep. at 63, 65); that Thompson never agreed to provide some of the services typically performed by an outfitter; and that Thompson at some point told Burch that he and Russcher could return later in the year for free. None of these facts, even if true, are sufficient to create a genuine issue of material fact with regards to whom Burch and Russcher transacted with. Conversely, OWA is not listed as an insured anywhere in Policy 68, nor was it ever a lessee from Scioto Land Company. Russcher had never heard the name MTHC prior to his accident and he never signed anything to effectuate him becoming a member of MTHC. As detailed in Section I, above, the entirety of Russcher's interactions with Thompson were made while Russcher believed he was transacting with OWA. Ultimately, Russcher sought out Thompson and OWA and paid for the right to hunt on Thompson's leased land for a limited amount of time. Russcher never contemplated he was coming to Ohio to join a hunt club and Thompson did not take the necessary steps to bring Russcher under the umbrella of MTHC before the time of his action.

Furthermore, even if the Court were to accept as true that OWA and MTHC were indistinguishable from one another and OWA was an insured under Policy 68, MTHC and/or OWA forfeited their rights under Policy 68 by operating as a commercial enterprise. Policy 68

explicitly limits coverage to "to occurrences arising out of the activities and operations of the hunt club . . . ." (Doc. 45-3, Policy 68 at PAGEID #1236). The Hunting License, which controlled the rights and obligations of the parties subject to the Scioto Land Company lease, also prohibited commercial hunting activity on the property. (Doc. 48-2, Hunting License at PAGEID #1542).

Plaintiffs cite *Moore v. Rice-Land Lumber Co.*, 14-500 (La. App. 3 Cir. 11/5/14);)150 So. 3d 657, 663 and simply state that the court found that a hunt club was not a "commercial hunting club for profit." To be certain, the *Moore* court did not hold that a hunt club could *never* be a commercial hunting club for profit. Rather, the court found there to be no commercial enterprise under the specific circumstances of those parties. In *Moore*, the hunt club members' dues were determined by the amount of the lease, and those dues only covered expenses. *Id.* In contrast, here, MTHC leased land for hunting and fishing purposes from Scioto Land Company for one year at the price of $2,318.16. The Court is not aware of the amount of yearly dues paid by each of the six listed members of MTHC. However, the record does reflect that Russcher paid $1,300 for his four-day hunt. The Court does not know the amount paid by Burch for the same hunt offered to Russcher, but it is not unreasonable to assume it was identical, or similar, to the amount paid by Russcher. Russcher also testified that while he was staying on the premises during his hunt, he never talked to Thompson about becoming a member of MTHC because, "I don't remember how many guys were [on the land] . . . but [Thompson] was busy." (Doc. 47-4, Russcher Dep. at 20 (insinuating that Russcher and Burch were not the only hunters using Thompson's leased land on that single weekend)). All of these facts underscore the commercial nature of the Thompson's operation at the time of Russcher's accident, and certainly differentiate the current case from *Moore*.

Accordingly, because Russscher transacted solely with OWA, OWA was not a named insured under Policy 68 and Thompson was conducting MTHC and/or OWA in violation of the Hunting License's terms prohibiting commercial hunting and fishing, Lloyd's of London 68 affords no coverage for Russscher's injuries under Policy 68.

**D.  Holland Community Hospital's Motion for Summary Judgment**

The Court notes that Holland Community Hospitals arguments in support of its own Motion for Summary Judgment are substantively identical to the arguments set forth in opposition to the Lloyd's of London Defendants' motions. Because the Court has ruled in favor of the Lloyd's of London Defendants on their motions, the same rationale applies in denying Holland Community Hospital's Motion for Summary Judgment.

## IV.   CONCLUSION

Based on the foregoing:

1)  Outdoor Underwriters, Inc.'s Motion for Summary Judgment is **GRANTED**;

2)  Lloyd's of London 50's Motion for Summary Judgment is **GRANTED;**

3)  Lloyd's of London 68's Motion for Summary Judgment is **GRANTED;** and

4)  Holland Community Hospital's Motion for Summary Judgment is **DENIED**;

The Clerk shall **REMOVE** Documents 45, 46, 47, and 48 from the Court's pending motions list and enter final judgment in favor of Defendants.

**IT IS SO ORDERED.**

  */s/ George C. Smith*  
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**